IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 15-cr-00277-CMA

UNITED STATES OF AMERICA,

   Plaintiff,

v.

**JOHN MICHAEL ASKINS**,

   Defendant.
_____

**MOTION FOR A VARIANT SENTENCE**
_____

   Mr. Askins, through counsel, Brian R. Leedy, Assistant Federal Public Defender, respectfully requests that the Court impose a three-year term of probation, with a special condition of 6 months home detention, as recommended by the author of the Presentence Investigation Report (hereafter "PSR", Doc. 25, R-1, R-).

   Mr. Askins has requested a one level downward departure in exchange for his waiver of appellate rights (Doc. 28), and the PSR author has recommended an additional offense level variance, to offense level 11, which falls in Zone B of the sentencing table and allows for a sentence of probation with home detention.[5]  PSR, R-5.  In support thereof, Mr. Askins states as follows:

I.  **Nature and Circumstances of Mr. Askins's Offense:**

_____

[5] Mr. Askins does not contest the imposition of restitution in the amount of $130,755.59.

**[18 U.S.C. § 3553(a)(1)]**

Mr. Askins knowingly underreported his income on tax returns.  Between 1989 and 2014 Mr. Askins owned 3 Service Master Carpet Cleaning Franchise licenses and operated a carpet cleaning business.  The licenses purchased were for 3 different geographic areas, Evergreen, Columbine and Northglenn, and cost $111,000, $35,000, and $18,000, respectively.  Mr. Askins financed the purchases of the licenses through bank loans.

His business had the capability of earning over $200,000 in gross receipts in a year, however, his business expenses could total over $100,000, as it did in 2010. **Attachment A** – 2010 Business Cost of Goods Sold (COGS) and Expenses personally earned between $50,000 and $90,000 a year, but due to the expense of the franchise licenses, he had to terminate them early, resulting in a $37,000 claim by Service Master, which Mr. Askins paid in 2014.

Before 2008, Mr. Askins employed a bookkeeper who utilized Quickbooks to manage the business accounts of the carpet cleaning business.  PSR ¶ 11.  When the bookkeeper left in 2008, Mr. Askins did not continue to use Quickbooks, or document his business income or expenses.  He didn't reconcile his accounts, and his lack of knowledge of any standard accounting procedures, and lack of effort to monitor his personal or business finances, left knowingly clueless of the true state of his financial health.  As the IRS investigator noted, his "risk for material misstatement [was] high because of poor internal controls and lack of separation of duties".

II.      **The Personal History and Characteristics of Mr. Askins**:
         **[18 U.S.C. § 3553(a)(1)][6]**

Mr. Askins is 61 years old, and is the oldest of 3 children born to his parents.  His father was a minister and part time painter, and his mother taught preschool.  Due to his father's occupation as a minister, the family moved often.  When Mr. Askins was 3 months old is family moved from Washington State to Arkansas, where he attended kindergarten.  The family then moved to California, Missouri, Colorado, Texas, and New Mexico, where Mr. Askins graduated from High School.  After High School Mr. Askins attended Pacific Coast Bible College in California, where he earned a degree in music.

Mr. Askins was married to Penny Allen from 1976 to 1992, with whom he has 3 children who are all in their thirties.  Two of his children with Ms. Allen support themselves financially, and David, age 35, attends Metro State College and is financially supported by Mr. Askins.  Since 1994 Mr. Askins has been married to Shelley Broodings, with whom his has 2 children, both of whom are in High School and live with Mr. Askins.  Mrs. Askins continues to support Mr. Askins.

As explained further below, Mr. Askins owned Service Master Franchises and operated a carpet cleaning business under those agreements from 1989 to 2014.  From November of 2014 to May of 2015 he worked as an estimator for Professional Restoration during which time he earned $60,000 a year.

When he was laid off from Professional Restoration he began HomeStar LLC, which is a carpet cleaning and restoration business.  Mr. Askins has no employees and

---

[6] This information is derived from Part C of the PSR unless otherwise noted.

3

operates his business in a van converted to transport and operate carpet cleaning machinery.  He solicits business online and cleans carpets, and performs restoration usually resulting from flooding, by himself.  His business struggled at the start, due in part to a $10,000 repair to his van, however, Mr. Askins hopes to become profitable early this year.

Mr. Askins is a hard worker, and is dedicated to making his carpet cleaning business successful.  He is in the process of attempting to learn how to use accounting software that will assist him in maintaining an accurate understanding of his finances and obligations.  Mr. Askins has recently started working with Amanda Adams, an accountant who he met through his church.  In exchange for free carpet cleaning Ms. Adams is advising Mr. Askins on how to reconcile his business and personal expenses and maintain accurate and reliable business records.

### III.    The United States Sentencing Guidelines:
###         [18 U.S.C. § 3553(a)(4)]

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point."  28 U.S.C. § 994(m).[7]

---

[7] The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system.  *See* 28 U.S.C. §  991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).

The original Commissioners quickly abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead, purportedly based the guidelines on empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1, Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).[8]

The Supreme Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of `empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence `greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id*. at 109-10.

Here, the applicable Guidelines [ §§ 2T1.1 & 2T4.1] are not the product of the Sentencing Commission employing an empirical study, as its designated mission, to establish past sentencing practices for convictions of this crime. Because the Commission failed to rely on empirical data or national experience in promulgating or

---

[8] In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id*. at 348-50.

amending §§ 2T1.1 & 2T41., and thus failed its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation.  *See Spears v. United States*, 129 S.Ct. 840, 843 (2009).

For starters, the Commission disregarded empirical data of past practice and pre-guidelines sentences in tax fraud cases when it promulgated § 2T1.1.  Under pre-guidelines practice, 50% of tax fraud defendant's received a probated sentence, the remainder served average sentences of 12 months.  This is a drastic difference from the promulgated guidelines where every single defendant receives a recommendation of imprisonment, and most recommendations are far removed from the pre-guidelines average of one year.  In the "background" section following § 2T1.1's application notes, the Commission readily admits to this deviation:

> Under pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of twelve months. This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length. As a result, the number of purely probationary sentences will be reduced. The Commission believes that any additional costs of imprisonment that may be incurred as a result of the increase in the average term of imprisonment for tax offenses are inconsequential in relation to the potential increase in revenue. According to estimates current at the time this guideline was originally developed (1987), income taxes are underpaid by approximately $90 billion annually. Guideline sentences should result in small increases in the average length of imprisonment for most tax cases that involve less than $100,000 in tax loss. The increase is expected to be somewhat larger for cases involving more taxes.

*See* USSG § 2T1.1, background commentary.

The Commission has further disregarded its designated mission by failing to monitor the national experience since the promulgation of the Guidelines and amend

6

them accordingly.  Despite the Commission's blatant disregard of past practice,

sentencing courts post-*Booker* seem to be drifting back towards the pre-guidelines

sentencing practices where a majority of tax fraud defendant's received probationary

sentences or, in the alternative, much lower sentences than what the Guidelines

currently recommend.  For example, in the fiscal year 2013, sentencing courts gave

below guideline sentences, without buy-in from prosecutors, to 45% of those sentenced

for tax crimes.[5]  An additional 20% received below guidelines sentences which

prosecutors sponsored, resulting in 65% of defendant's convicted of tax crimes in fiscal

year 2013 receiving below guidelines sentences.[6]

Furthismore, the United States Sentencing Commission notes that the average

sentence for a tax fraud defendant during the fiscal year 2013 was just 14 months, with

a median of 12 months.[7]  Such averages being in line with the pre-guidelines

sentencing practices for those defendants who did not receive a probated sentence.

The Commission's statistics further note that, in those cases where sentencing judges

handed out a downward departure citing the *Booker* decision, the median sentence was

cut by 78.5%.[8]

---

[5] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2013/Table27.pdf

[6] *Id.*

[7] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2013/Table13.pdf

[8] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2013/Table31c.pdf

This revolt could, in large part, be based on the realization that the fraud guidelines in general, but specifically the loss charts that drive the fraud guidelines, were not the product of the Sentencing Commission employing an empirical study, but instead, "[t]he history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as the amounts climb.  The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *United States v. Coursey*, 723 F.3d 366 (2nd Cir. 2013)(Underhill, J., concurring).

## IV.   A Condign Sentence:

Section 3553(a)'s parsimony clause instructs that a Court impose a sentence that is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, to protect the public from further crimes, and to afford the defendant with needed training, medical care, or treatment.  A sentence of probation satisfies this factors.

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity."  Richard S. Frase, Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?, 89 Minn. L. Rev. 571, 590 (February 2005).  The guidelines include none of the factors bearing on Mr. Askins's degree of culpability.

The harm here is clearly the loss of the taxes Mr. Askins owed to the Internal Revenue Service.  His degree of culpability relates to his intent to avoid a debt owed, and the acts of underrepresenting what his cleaning business made in his tax returns. Mr. Askins worked hard to earn his business income honestly, but was simply not honest about how much of that income he owed to the government.

A. Deterrence.

A felony conviction and sentence of probation will deter Mr. Askins from further criminal conduct.  Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[9]    Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.[10] The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.  *Id.* at 1.  It examined the effects of changes to both the certainty and severity of punishment.  *Id.*  While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to

---

[9] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."  *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

[10] *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF.

achieve statistical significance." *Id.* at 2.  The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1.

Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment.[11]   According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

B. <u>Mr. Askins's Low Risk of Recidivism</u>

In past studies, the Sentencing Commission has observed that criminal history points predict a defendant's future risk of recidivism far better than the criminal history category.  In that regard, the zero criminal history point offender represents an extreme example of this phenomenon: as an offender without a single criminal history point, Mr. Askins presents only a little more than 10% risk of recidivism the first 24 months after release; by contrast, the other offenders in his criminal history category (those with one criminal history point) have twice his recidivism rate.  *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 7 (2004).

---

[11] *See* David Weisburd *et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, supra, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

Other than the wildly variant recidivism statistics among offenders in Category Six, the increase in recidivism rates after offenders acquire their first criminal history point represents the single steepest increase in recidivism accompanying the addition of a single criminal history point. *See* U.S. Sentencing Commission, *Measuring Recidivism*, at 7 (2004). In short, the Commission has observed that "scoring at the minimum value of zero on the CHC indicates a very low recidivism risk." <u>See</u> U. S. Sentencing Commission, *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score*, at 5 (2005). This research has been explicitly undertaken in connection with the Commission's duty to formulate Guideline revisions. *Id.*

Given this very low risk of recidivism, the Guidelines, as they apply to Mr. Askins, overstate the need for incapacitation and specific deterrence. Congress, in their original directive to the Sentencing Commission, never instructed or compelled the Commission to treat offenders with no prior criminal history in a manner equivalent to those with countable criminal convictions. To the contrary, Congress explicitly distinguished the two:

> The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.

28 U.S.C. 994(j).

At times, the Guidelines may represent a fair aggregation of the 3553(a) factors; in this case, as the Commission as recognized, they overstate the need for

11

incapacitation and specific deterrence when an offender such a Mr. Askins has absolutely no prior criminal history.  Mr. Askins is a first time offender, has not been convicted of a crime of violence or similar serious offense, and presents a very low risk of recidivism. Mr. Askins is exactly the type of offender Congress was envisioning when instructing the Commission to create guidelines that reflect the general appropriateness of imposing sentences other than imprisonment in cases where the defendant is a first time, non-violent offender.  Unfortunately, the Commission did not heed Congress's directive and, instead, created a Guidelines regime that never recommends probation.

      C.    <u>There is No Need for Incapacitation.</u>

      Mr. Askins is 61 years old, a first time offender, a college graduate, and has been employed throughout his adult life, and has no history of drug or alcohol abuse.  Mr. Askins has not been convicted of a crime of violence, or otherwise similarly serious offense.  As such, Mr. Askins presents an extremely low risk of recidivism, as evidenced by the lack of any additional criminal conduct or activity over the six years that have passed between the end of the instant offense and his sentencing.

      In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Askins, this Court should consider the statistically low risk of recidivism presented by Mr. Askins's personal history and characteristics. *See, e.g., United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not

12

included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007)

(affirming below-guideline sentence based on defendant's age, which made it unlikely

that he would again be involved in a violent crime); *United States v. Urbina*, slip op.,

2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism

indicated by defendant's lack of criminal record, positive work history, and strong family

ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting

variance because defendants "with zero criminal history points are less likely to

recidivate than all other offenders"); *Simon v. United States*, 361 F. Supp. 2d 35, 48

(E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release

because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL

300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant

because recidivism drops with age); *United States v. Ward*, 814 F. Supp. 23, 24 (E.D.

Va. 1993) (granting departure based on defendant's age as first-time offender since

guidelines do not "account for the length of time a particular defendant refrains from

criminal conduct" before committing his first offense).

### V.   <u>Conclusion</u>:

A sentence of probation with home detention would be sufficient, but not greater

than necessary, to achieve the goals and purposes of sentencing.  Such a sentence

would adequately reflect the seriousness of the offense, promote respect for the law,

provide adequate deterrence and protection from further crimes, while, at the same

time, reflect the unique personal history and characteristics of Mr. Askins.  A probated

sentence, in addition to the substantial collateral consequence of a felony conviction

would also be in line with the empirical data of past practice and pre-guidelines sentencing.  Additionally, based on fiscal year 2013 statistics, a variance, particularly to the degree sought here, would not create an unwarranted disparity.  Accordingly, Mr. Askins would ask the Court to impose the recommended sentence.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


s/Brian R. Leedy_____
BRIAN R. LEEDY
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Email:  brian_leedy@fd.org
Attorney for Defendant

14

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2016, I electronically filed the foregoing

## MOTION FOR A VARIANT SENTENCE

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Martha Ann Paluch
Assistant U.S. Attorney
Email:  martha.paluch@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Mr. John Michael Askins (U.S. Mail)

s/Brian R. Leedy
BRIAN R. LEEDY
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Email:  brian_leedy@fd.org
Attorney for Defendant